UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ROBERT  PEALS,                                    )
                                                  )
                        Plaintiff,                )
                                                  )
             vs.                                  )
                                                  )        1:11-cv-01069-RLY-DML
ELI LILLY,                                        )
                                                  )
                        Defendant.                )

**ENTRY ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Robert Peals, is suing his former employer, Defendant, Eli Lilly

("Lilly"), for racial discrimination and retaliation under Title VII.  Peals alleges that his

employment was terminated based on his race and in retaliation for reporting racial

discrimination.  Lilly, on the other hand, argues that his employment was terminated for

his poor performance.  Lilly moves for summary judgment.  For the reasons stated below,

Lilly's motion is **GRANTED in part** and **DENIED in part**.

### I.      Background

Peals, an African American, began his employment with Lilly on March 31, 2008, as

a Fixed Duration Employee ("FDE") in the Utilities Department.  (Deposition of Robert

Peals ("Peals Dep.") 34:14-35:5).  On November 23, 2009, Peals received an FDE

position as Operator I ("packaging operator") in the Parenteral Packaging Department

("PPD").  Packaging operators package injectable items; the work is organized in four

different lines.  (Deposition of Joseph Ferguson ("Ferguson Dep.") 12:12-18, 12:25-13:1-

1

8). As part of his contract with Lilly, Peals agreed that his employment would begin on December 7, 2009, and would end on December 2, 2012, unless either party terminated it earlier. (Peals Dep. 118:14-119:8; Ex. 22 ¶ 8).

## A. Peals' Performance

Peals initially reported directly to Duane Weddle, one of four supervisors in the PPD. (Peals Dep 130:14-18; Ferguson Dep. 11:9-22). Weddle was also in charge of training the new hires. (Affidavit of Duane Weddle ("Weddle Aff.") ¶ 3). He did not, however, have enough resources to train all the employees at the same time. (*Id.*). As a result, he staggered the training. (*Id.*). Peals felt as though he was not being properly trained by Weddle, which he reported to Human Resources on February 24, 2010. (Peals Dep. 152:17-25, Ex. 31). Specifically, Peals wrote that he believed "Weddle [was] not training him on purpose" and "was singl[ing] him out for whatever reason." (*Id.*). A follow-up meeting was scheduled on the issue; however, Peals did not attend. (*Id.* at 153:17-154:1, 154:17-155:19). Peals sent a letter the day after the meeting indicating that he had not been notified of it. (*Id.* at 155:22-156:12, Ex. 33).

Peals' employment file contains evidence of numerous mistakes – some of which he was disciplined for and others that he was not. Peals was not disciplined for the following:

- in April 2010, leaving his line without notifying his supervisor;

- in May 2010, signing for a task before a machine was clear;

- in June 2010, signing to verify the Labeler without having logged in to confirm that the counts had been cleared and not carrying the line clearance checklist with him as he was clearing it;

- in December 2010, leaving the line without authorization; and

- in July 2011, calling into work thirty minutes late.

(Supplemental Affidavit of Duane Weddle ¶ 3, Ex. A).

Peals was disciplined in the form of two Feedback/Coaching Forms. He received one in April and one in November, which disciplined him for the following:

- in April 2010, failing to follow procedures for performing electronic monitoring tests and documentation requirements;

- in April 2010, signing for tasks that had not yet been completed;

- in April 2010, falling behind while running the line when his instructor was not present; and

- in November 2010, failing to follow a procedure when he placed a vial labeled "After Counter Discard Vial" into the "Before Counter Discard Tray

(Peals Dep. 175:14-176:1, 185:10-25, 350:17-24, Exs. 36, 59).

**B. Peals' First Feedback/Coaching**

The most serious charge in Peals' first Feedback/Coaching from April 2010 was his initialing of a document indicating that he had completed a test when, in fact, he had not. (Deposition of Duane Weddle ("Weddle Dep.") 85:6-86:12, Ex. 36; Weddle Aff. ¶ 6). Weddle informed Peals that this could be falsification, which is a ground for immediate

termination. (*Id.*). Human Resources Consultant Dan Neumann listened to Peals' explanation for the mistake and then placed Peals on a paid suspension while he investigated further. (Peals Dep. 185:13-187:9).

That afternoon, Peals called Lilly's hotline to again report his concern about his training. (*Id.* at 187:14-16, 189:11-24). On April 20, 2010, Peals filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation with regard to training. (*Id.* 241:3-22, Ex. 41). Lilly investigated his claims, but found no evidence to substantiate them. (Affidavit of Mike Lakin ("Lakin Aff.") ¶ 10, Ex. A).

Neumann's further investigation into Peals' error did not find deliberate falsification; however, he still recommended the early termination of Peals' contract. (Lakin Aff. Ex. B). Despite this recommendation, Peals' contract was not terminated and he returned to work where he received his first Coaching/Feedback instead. (Lakin Aff. 11, Ex. B).

### C. Peals' Interim Review

Peals received an interim and final performance evaluation while at Lilly.[1] Peals received his interim performance evaluation on July 27, 2010, from Weddle. (Peals Dep. 298:16-299:17, Ex. 53). In this evaluation, Weddle wrote "Robert's performance to this point has been unsatisfactory." (*Id.*). Furthermore, the evaluation noted that he fell behind while running the line when his instructor was not present, signed that he was

---

[1] Both are on the same form; the comments designate whether they are from the interim or final evaluation.

ready to operate the Weiler Labeler after completing training but later told his supervisor that he was not ready, and did not listen or reacted negatively to feedback. (*Id.*).

**D. Peals' Second Coaching/Feedback**

On November 30, 2010, Peals received his second Coaching/Feedback from Weddle for failing to follow a procedure when he placed a vial labeled "After Counter Discard Vial" into the "Before Counter Discard Tray." (Peals Dep. 350:17-24, Ex. 59). Weddle issued the Coaching/Feedback form as a result of another employee reporting that he had discovered that a vial count was short because Peals had misplaced the vial. (Weddle Aff. ¶ 8). Peals admits that this would be a deviation from procedure, but denies that he did it. (*Id.* 353:2-7).

**E. December 2010 and Peals' Final Review**

At some point in 2010, Joseph Ferguson replaced Weddle as Peals' supervisor. Ferguson sent an email to Peals on December 9, 2010, in which he informed Peals that he had been monitoring him. (Ferguson Dep. Ex. 96). He indicated that Peals needed to continue to work at gaining knowledge technically and procedurally, but that this was to be expected considering his newness. (*Id.*). Ferguson indicated that it takes many months and sometimes years for an employee to become proficient on the equipment. (*Id.*).

In December 2010, Peals received his annual performance evaluation from Ferguson. This time Ferguson wrote, [Peals] needs to strengthen his knowledge of procedures as it relates to his job duties." (Peals Dep. Ex. 53). In addition, the evaluation notes that Peals spent "August and September working in DDAO Operations

with some of his peers . . . . He willingly worked overtime to support the initiative and the feedback from the area was positive (learned quickly, team player and communicated well)." (*Id.*). The evaluation also rated Peals in five categories with a rating scale of exemplary, high successful, successful, low successful, and unsatisfactory. (Peals Dep. Ex. 53). Peals received low successful ratings in engagement, teamwork, and values; he received successful ratings in accountability and action.[2] (*Id.*). Ferguson testified that Peals was doing better at this point, but still making mistakes and overall performance was "pretty low." (Ferguson Dep. 149:1-4).

## F. 2011 and Peals' Termination

Lilly does not mention any documented performance issue with Peals from December 2010 to July 2011. But then, on July 13, 2011, Peals circled "P" (for pass) for a test that he did not perform. (Ferguson Dep. 144:16-145:11). This was discovered because several other employees had not documented anything for that test, because it was not applicable to that particular order. (Ferguson Dep. 144:18-145:11). According to Ferguson, this "error indicates [Peals] is not reading instructions thoroughly prior to completing and documenting tasks." (*Id.* 145:12-22).

Then on July 16, 2011, Peals circled "P" for six tests that he had not performed correctly. (*Id.* at 146:2-22). Ferguson reports that he created a Trackwise record, but had no follow up discussions because Peals was not present when the record was completed.

---

[2] Low successful is defined as "achievement of some expected business results but needs improvement on some specific behaviors or outcomes." (Ferguson Dep. Ex. 53). Successful is defined as "consistent achievement of expected and sometimes superior business results and demonstration of effective behaviors." (*Id.*).

(Ferguson 146:23-147:9). As a result of these incidents, on July 20, 2011, Ferguson contacted Human Resources Consultant Mike Lakin about terminating Peals' contract "for persistent poor performance." (Lakin Aff. ¶ 4).

On July 27, 2011, Peals again called Lilly's hotline to report an incident of discrimination. (Lakin Aff. ¶ 5). Coincidentally, Lakin answered the call. (*Id.*). Peals reported that throughout the past two weeks, a coworker, Jeffrey Fleener, who is Caucasian, failed to clear the line of product literature twice without any consequence. (*Id.* at 6). Lakin found the allegation to be unsubstantiated when his investigation revealed that Ferguson had discussed the issue with Fleener. (*Id.*).

By the time of the phone call, Lakin "had already evaluated Ferguson's discharge recommendation, agreed that termination of Peals' contract was appropriate, and was in the process of obtaining approval for the contract termination from [Human Resource's] respective line management and Lilly's HR Legal and Employment Practices Departments." (Lakin Aff. ¶ 5). On July 28, 2011, Lakin received approval from Lilly's HR Legal and Employment Practices Departments to terminate the contract for poor performance, specifically, failure to follow procedures and document properly. (Lakin Aff. ¶ 7). The termination would be effective on July 29, 2011. (*Id.*).

On July 29, 2011, the day of his termination, Peals found a drawing of a raccoon in a suit labeled "Coon Daddy"[3] partially stuck in his work locker. (Affidavit of Robert Peals

---

[3] According to urbandictionary, a coon daddy is a derogatory name for someone who has fathered an African American child. *See* http://www.urbandictionary.com/define.php?term=coon+daddy (last visited Feb. 11, 2014) . "Coon" is an insulting name for an African American similar to "n*gger".

("Peals Aff.") ¶ 11). Peals took the racially offensive drawing to Ferguson and informed him that he was offended by it. (Peals Aff. ¶ 12; Ferguson Dep. 27:20-25-28:1-9). Ferguson presented the drawing to Lakin. (Ferguson Dep. 27:20-25-28:1-9). Nevertheless, Lakin and Ferguson terminated Peals' contract that day.

### G. Additional Reports of Discrimination

In addition, Peals complained to Human Resources that his peers were sabotaging his work by placing product literature on the line after he verified that the line was clear. (Peals Dep. 260:10-13). Peals was not disciplined for the literature on his line. Furthermore, a picture of President Obama with exaggerated lips and ears was posted in an employee's cubicle while Peals worked in PPD. (Peals Aff. ¶ 10, Ferguson Dep. Ex. 68).

### II.     Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

---

http://www.urbandictionary.com/define.php?term=coon (last visited Feb. 11, 2014); *see also*, http://dictionary.reference.com/browse/coon (last visited Feb. 11, 2014).

On a motion for summary judgment, the burden rests with the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id*. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87); *see Celotex*, 477 U.S. at 322-24; *see also Anderson*, 477 U.S. at 249-52.

## III.    Racial Discrimination Claim

Peals alleges that his claim survives summary judgment for direct and indirect discrimination. For the reasons explained below, the court finds that a reasonable jury could conclude that Peals has a claim for indirect discrimination, but not for direct discrimination.

### A. Indirect Discrimination

In order to establish a claim of indirect discrimination, the plaintiff must establish a prima facie case of discrimination; the defendant then must articulate a legitimate non-discriminatory reason for its action; and the plaintiff must prove that reason is pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). A prima facie case of discriminatory termination is shown when a plaintiff proves the following: (1) he is a member of a protected class; (2) he was meeting the legitimate expectation of

defendant; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees. *See Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). It is undisputed that Peals is a member of a protected class and that he suffered an adverse employment action. Therefore, only the second and fourth elements are at issue. The second and fourth elements merge when an employer applies its legitimate expectations in a discriminatory fashion and the analysis proceeds directly to pretext. *See Curry v. Menards, Inc.*, 270 F.3d 473 (7th Cir. 2001).

To show that Lilly applied its expectations in a discriminatory fashion, Peals must submit evidence of similarly situated employees who were treated more favorably. When evaluating the comparators, the Seventh Circuit has held "that the similarly-situated inquiry is flexible, common-sense, and factual. It asks 'essentially, are there enough common features between the individuals to allow a meaningful comparison?'" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008)). There must be "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Id.* The key factors that a plaintiff must usually show are that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (internal citations omitted). "This is not a 'magic

formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Id.* (internal citations omitted).

1.    <u>Same Standards of Conduct</u>

The Seventh Circuit has found that "the question is not whether the employer classified the comparators in the same way, 'but whether the employer subjected them to different employment policies.'" *Id.* at 848 (citing *Lathem v. Dep't of Children & Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999). In *Coleman*, the Court found that the comparators were substantially similar despite their differing job titles because they were subject to the same standards of conduct, violated the same rule, and were disciplined by the same supervisor. *Id.*

Here, Peals proffers multiple Caucasian comparators who worked as packaging operators in the PPD, including Carol Patrick, Robert Rebennack, Poppy Fouts Miller, Steve Cook, Judy West, Jeff Fleener, Scott Courtney, and Jodi Wickliff Courtney. All are FTEs, rather than FDEs. Lilly argues that none of the comparators are subject to the same standard of conduct, because as full time employees, they are subject to a different disciplinary process. Peals responds that the difference in these policies is the number of stages and not that FTEs should either not be disciplined or disciplined less harshly.

FTEs are subject to progressive discipline, which involves a verbal warning, written warning, probation, and then termination. (Ferguson Dep. at 20:13-25). If the employee repeats the mistake within three years, then the discipline taken moves up to the next step. (Exhibit 74, Employee Handbook, Discipline, Appendix A). FDEs, on the other hand, do not benefit from this progressive structure. Rather, they have one or two

chances prior to termination depending on the type of mistake made. (Ferguson Dep. at 21:14-25). According to the employee handbook:

> Because FDEs are contracted with a specific skill for a limited time period; FDEs receive a Documented Coaching to improve performance before termination of contract. . . . If Documented Coaching does not result in improved performance behavior, the next step may be contract termination.

(Exhibit 74, Employee Handbook, Discipline, Appendix A).

Despite the different discipline procedures, an FDE and an FTE work the same kind of work, receive the same training, and are under the same rules and regulations. (Ferguson Dep. 15:4-9, 17:20-23). Therefore, although the type of discipline the employee receives may vary based on the employee's classification as an FTE or FDE, the employees should equally face discipline for violating the same procedures.

### 2. Conduct of Comparable Seriousness

The Seventh Circuit has adopted the "comparable seriousness" standard. *Coleman*, 667 F.3d at 848. This means that the comparators need not have engaged in identical conduct, but only similar misconduct. *Id.* For example, in *Ezell v. Potter*, the Seventh Circuit reversed the district court and found that a postal employee disciplined for taking too long of a lunch break while delivering mail was similarly situated to an employee who lost a piece of certified mail. 400 F.3d 1041, 1050 (7th Cir. 2005). The Seventh Circuit reasoned that losing a piece of certified mail was equal if not worse than taking too long of a lunch break. Therefore, taking too long of a lunch break should not have resulted in an adverse employment action if the employee who lost the piece of

certified mail was not disciplined.  *Id.*  With these factors in mind, the court will examine the proffered comparators.

### 3.    The Proffered Comparators

Usually, whether a comparator is similarly situated is a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiff has met his burden on the issue.  *See Coleman*, 667 F.3d at 846.

All of the proffered comparators are Caucasians, who were employed as packaging operators in the PPD during the same time as Peals.  All of the comparators are FTEs.  Additionally, Weddle and/or Ferguson supervised the employees at the relevant times.

#### a.  Carol Patrick

Peals first offers Carol Patrick as a comparator.  Patrick had several documented mistakes from 2008 to 2013; however, only one is for conduct of comparable seriousness to the conduct Peals received discipline for.  In November of 2008, Patrick signed to verify that there were six After Counter Discards, when in fact, there were only five. (Ferguson Dep. 40:11-19, Ex. 78).   Weddle gave Patrick a documented verbal warning. (*Id.*).  This conduct is comparable to when Peals circled pass for more tests than he actually performed in July 2011.  Peals was terminated after he committed the same mistake just a few days later.  Patrick did not repeat her mistake.  The court therefore finds that Patrick is not a valid comparator, and even if she were, that she was not treated more favorably than Peals.

### b. Robert Rebennack

Robert Rebennack was a packaging operator in PPD for approximately ten years. Ferguson was his supervisor. Rebennack was not disciplined for signing for areas of the line clearance before doing the task. (Ferguson Dep. Ex. 88). The procedure required Rebennack to sign after completing the task. (*Id.*). Peals twice performed a similar error. The first time Peals committed a similar error of signing before preforming the task, it resulted in his Coaching/Feedback in April 2010 and a suspension. The second time, he was not disciplined for it. In addition, both Rebennack and Peals received three low successful and two successful ratings on their 2010 evaluations. (Ferguson Dep. Ex. 95). The court finds that Rebennack and Peals are substantially similar and that a jury could reasonably find that Rebennack received more favorable treatment than Peals.

### c. Poppy Fouts (Miller)

Poppy Fouts, is a senior specialist in the PPD, who performs packaging. (Weddle Dep. 66:1-25-67:1). Fouts performed a test she was not qualified to perform; she was not disciplined. (Weddle Dep. 73:6-7,25, Dep. Ex. 149). Nearly a year later, Fouts failed to properly document the start of order test; again, she was not disciplined. (Weddle Dep. Ex. 150). Both times, Ms. Fouts' was not under the supervision of Ferguson or Weddle. (Weddle Dep. Exs. 149, 150). As such, the court finds that Fouts is not similarly situated to Peals. Therefore, the court finds that she is not an appropriate comparator.

### d. Steve Cook

In March 2008, Steve Cook verified five after-counter discards were on the order, when in fact there were only four. He was informed by Weddle that this was

unacceptable and could be considered falsification. As a result, Cook received a documented verbal warning. (Weddle Dep. Ex. 124). Approximately six months later, Cook documented that six after-counter discards were on the order, when there were only five. Again, Cook received a documented verbal warning. (Weddle Dep. Ex. 126). According to Lilly's employee handbook, Cook's second error should have resulted in more than a documented warning. The court finds that Cook engaged in conduct of comparable seriousness, and thus is similarly situated to Peals. Furthermore, a reasonable jury could find that Cook received more favorable treatment than Peals.

e. Judy West

In February 2010, Judy West documented that she performed a test that she did not perform. Weddle, as her supervisor, gave her a documented verbal warning. (Weddle Dep. Ex. 136). A few days after that incident, West failed to place a previously labeled vial in the designated slot of the tray on the carton. She received no discipline as a result of this incident and was only given a follow up discussion. Peals, on the other hand, received his second Coaching/Feedback for similar conduct. The court therefore finds that West and Peals were similarly situated and that a jury could reasonably find that West was treated more favorably than Peals.

f. Jeff Fleener, Scott Courtney, and Jodi Wickliff Courtney

Peals lists Jeff Fleener, Scott Courtney, and Jodi Courtney as examples of employees who have a history of mistakes and incorrect documentation. These mistakes vary from attendance to line clearance issues. Because Peals was not disciplined for

failing to clear the line, the court finds that these individuals were not treated more favorably than Peals.

The court finds that Peals has met his burden. A reasonable fact-finder could find that the conduct of West, Cook, and Rebennack are similar enough to Peals to allow an inference that intentional discrimination may be at play.

4.     Legitimate Reason

Pursuant to the *McDonnell Douglas* framework, Lilly must offer a legitimate, non-discriminatory reason. *See McDonnell Douglas Corp*, 411 U.S. at 803. Lilly's proffered explanation is that Peals performed poorly and violated numerous company procedures. This is a legitimate reason, and Lilly has met its burden.

5.     Pretext

To demonstrate pretext, "the plaintiff must also show the employer lied about its proffered explanation." *Johnson v. Nordstrom*, 260 F.3d 727, 732 (7th Cir. 2001) (quoting *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998)). To prove pretext indirectly, the plaintiff must show one of the following: "(1) Defendant's explanation of Plaintiff's discharge had no basis in fact, or (2) the explanation was not the 'real' reason, or (3) at least the reason stated was insufficient to warrant the [termination]." *Id.* In addition, to show pretext the plaintiff may show that similarly situated employees were treated more favorably. *See Coleman v. Donahoe*, 667 F.3d at 858; *see also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 985 (7th Cir. 2001) ("to show pretext (as well as the fourth element of a prima facie case) the inquiry remains the same: the plaintiff must show that similarly situated employees were treated more

16

favorably than the plaintiff") citing *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998); *Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994) ("In order to demonstrate pretext under the *McDonnell Douglas* analysis, a plaintiff may put forth evidence that (1) employees outside of the protected class . . . , (2) who were involved in acts of comparable seriousness, (3) were nevertheless retained or rehired (while the plaintiff was not)."). In fact "evidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." *Coleman*, 667 F.3d at 857 (citations omitted). Therefore, the analysis between the fourth prong and the pretext stage often dovetail and allow an inference of intentional discrimination. *See Rodgers v. Eli Lilly & Co.*, No. 1:11-cv-00306-JMS-DML, 2013 WL 2251317 (S.D. Ind. May 22, 2013) (citing *Coleman*, 667 F.3d at 857).

Peals argues that the comparator evidence is enough to show pretext here, and the court agrees. The selective application of Lilly's rules and the disciplinary process at play in the PPD is enough that a reasonable jury could find that the rules were used as pretext for discrimination. As such, the court **DENIES** Lilly's motion for summary judgment on the indirect discrimination claim.

### B. Direct Discrimination

Under the direct method of proof, a plaintiff's claim survives summary judgment if he can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Nagle v. Vill. Of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). The direct method of proof may be shown by direct or circumstantial evidence. *Id.* Peals presents no direct evidence of discrimination, but rather relies on circumstantial

evidence. There are three categories of circumstantial evidence in employment discrimination cases:

> (1) Suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is pretext for discrimination.

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)(citations omitted).

Peals offers evidence of the alleged disparate treatment he received compared to other employees, such as Judy West. This evidence does not fall into categories one or three, and may fall under category two. However, the court finds that Peals did not show that employees outside of the protected class systematically received better treatment. As discussed above, Peals only offered three employees that a jury could find were treated more favorably than him; this is not enough to make a systematic showing. Peals, thus failed to provide the requisite circumstantial evidence for direct discrimination, and the court, therefore, **GRANTS** summary judgment on this claim.

## IV.    Retaliation Claim

Peals alleges that he was terminated in retaliation for complaining and reporting racial discrimination. To establish a retaliation claim, a plaintiff must prove: (1) he engaged in protected activity; (2) he suffered a material adverse action; and (3) a causal connections exists between (1) and (2). *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

## A. Protected Activity

The parties do not dispute that Peals engaged in a protected activity when he filed a complaint with the EEOC on April 20, 2010.  Peals also alleges that he was engaging in protected activity when he was complaining of racial discrimination on the day he found the "Coon Daddy" drawing in his locker.

"While a report of discrimination to a supervisor may be statutorily protected activity under Title VII, the report must include a complaint of [] discrimination or sufficient facts to raise that inference."  *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008).  Peals' complaint had sufficient facts to raise an inference of discrimination because he complained of the racial nature of it.  (Peals Aff. ¶ 12; Ferguson Dep. 27:20-25-28:1-9).  In addition, Ferguson appeared to have understood it to be a discrimination complaint when he took the drawing to Lakin of Human Resources.  (Ferguson Dep. 28:18-25, 29:1-9).  As such the court will consider it to be protected activity.

## B. Adverse Action

There is no dispute that Peals suffered an adverse employment action – his termination.

## C. Causal Connection

A causal connection may be shown by temporal proximity, however, it is not "dispositive in providing or disproving a causal link."  *See Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005) (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003)).  In addition, it will "rarely be sufficient in and of itself to create a triable

issue." *Id.* (citing *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)).

Peals alleges that a causal connection exists as his employment was terminated the same day he complained about the racially offensive "Coon Daddy" drawing. Lilly argues that there can by no causal connection between the two because the decision to terminate was reached prior to that complaint. *See Powell v. Rumsfeld*, 42 Fed. App'x. 856, 860 (7th Cir. 2002) (finding no casual connection when an employee's performance evaluation was prepared one day before his engagement in protected activity).

The court has been given no reason to doubt Lakin's sworn affidavit that he had received authority on July 28, 2011, to terminate Peals' contract effective July 29, 2011. As such, the report of the racially offensive drawing occurred after the decision to terminate was made. The court finds no causal connection, and therefore, **GRANTS** summary judgment on the retaliation claim.

## V. Conclusion

The court **GRANTS in part and DENIES in part** Lilly's motion for summary judgment (Docket # 71). The court **GRANTS** summary judgment on the direct discrimination and retaliation claims. The court **DENIES** summary judgment as to the

indirect discrimination claim.

**SO ORDERED** this 14th day of March 2014.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.